Filed 4/13/26  P. v. Forehand CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS ROBERT FOREHAND,<br><br>    Defendant and Appellant. | D084586<br><br><br>(Super. Ct. No. SCD297619) |

APPEAL from a judgment of the Superior Court of San Diego County, David L. Berry, Judge.  Affirmed.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Charles C. Ragland, Chief Assistant Attorneys General,  Arlene A. Sevidal, Randall D. Einhorn and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Nicholas Robert Forehand appeals from a conviction for first degree murder based on an aiding and abetting theory.  He asserts the trial court erred by admitting incriminating statements made to undercover operatives

during a *Perkins* jail operation,[1] and that there was insufficient evidence to support a conviction for deliberate, premeditated murder. Although we note some concerns with the nature of the *Perkins* operation in this case, we ultimately conclude that the trial court did not err by admitting the statements, and that there was sufficient evidence to support a conviction for first degree premeditated murder. Accordingly, we affirm the conviction.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The People charged Forehand with one count of murder. They acknowledged that he was not personally armed, but asserted he was a principal in the commission of the offense. The People's theory was that Forehand and his accomplice, 17-year-old Stephen O.,[2] were both gang members when Forehand drove Stephen to the victim's residence and Stephen then shot the victim, Brian Mendoza Camacho, twice in the torso, causing his death.

### A.    Prosecution's Evidence at Trial

### 1.    San Diego Police Officer Michael Wheelus

At around 9:30 on the morning on October 5, 2022, San Diego Police Officer Michael Wheelus responded to a call of a shooting on Deering Street in Mira Mesa. On arrival, Officer Wheelus found Camacho lying on the ground with a faint pulse and shallow breathing. Camacho did not say anything to Officer Wheelus before he died at the scene. The People played the footage from Officer Wheelus's bodyworn camera for the jury.

---

1    See *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

2    Stephen O. was a minor at the time of the shooting. We refer to him by his first name for the remainder of the opinion, meaning no disrespect.

## 2. Eyewitness Accounts

### a. *Tom Ohlson*

Tom Ohlson lived on the same street as Camacho. At about 9:30 on the morning of the shooting, he saw a silver car driving northbound. The car caught his attention because it was moving slowly and the passenger appeared to be looking around. He did not see the car turn around, but he did see it pass a second time, still traveling north.

Ohlson heard loud noises that sounded like gunfire. He pulled the window covering back and saw the car he had noticed earlier speeding away. He went outside and saw Camacho lying in the street, next to his car. Ohlson called 911, and the recording was played for the jury. Ohlson told the operator there were two Hispanic men in the car, in their late 20's or early 30's. The prosecutor showed Ohlson a video clip of a car, and he identified it as the car he saw driving around the area. There were two loud sounds at 9:25 a.m., which Ohlson identified as the gunshots he heard.

### b. *Linda Landingham*

Linda Landingham was at her parent's house, on the same block as Camacho, on the morning of the shooting. She heard two loud bangs and thought maybe something fell in the garage. She then received a call from her father-in-law's caregiver telling her to "come outside immediately." She saw Camacho lying in the driveway next to his car and ran back inside to call 911 from a landline. Landingham's 911 call was also played for the jury.

### c. *Lilia Ruvalcaba*

Lilia Ruvalcaba was sitting in her kitchen around 9:30 a.m. on the morning of the shooting. She heard two loud bangs. She thought it was strange because the neighborhood was usually very quiet at that time of day.

3

About 30 minutes later, she saw police activity outside. The police asked if she had a working doorbell camera but she did not have any relevant footage.

#### d. *Gilbert Camacho*

Camcho's uncle, Gilbert Camacho, was in his bedroom at the family home on the morning of the shooting. His room was on the side of the house facing the street. He heard a car approach, followed by two male voices speaking, and about five minutes later, two gunshots. He told a police officer that the voices he heard did not sound like an argument.

#### e. *Sergio Camacho*

Camacho's brother, Sergio, explained that Camacho was 18 years old at the time of the shooting. Camacho had graduated from high school the previous June and was taking college classes. Camacho was living in the family home with their mother and typically left the house around 9:30 in the morning on Monday, Wednesday, and Friday to go to school.

Camacho and Sergio spoke on the phone several times a day most days. Sergio spoke to Camacho briefly on the morning of the shooting, while Camacho was getting ready for school. It was a normal conversation, and Camacho did not seem nervous or anxious. An hour later, Sergio learned that his brother had been shot and killed in front of his home.

Sergio had never heard the names Nicholas Forehand, Stephen, or Stephen's moniker "Daps."

### 3. Crime Scene Investigation

Courtney Brown, a crime scene specialist for the San Diego Police Department, documented the scene and collected evidence after the shooting. Brown photographed and collected several items found on the street near Camacho's body, including two cartridge casings, a black cell phone, and a keychain with a lanyard. The contents of the cell phone appeared to belong

to Camacho. There was no communication found between either Camacho and Forehand or Camacho and Stephen on the phone.

The police impounded Camacho's vehicle, parked near the scene, and discovered a copper jacketed bullet embedded in one of the tires, which they removed and preserved as evidence. During the autopsy they recovered a second copper jacketed bullet from Camacho's body.

Jodi Brown, a DNA analyst from the San Diego Police Department crime lab, attempted to obtain DNA from the casings, but determined there was not enough present for a valid result. Laura Molyneaux, a firearm analyst in the crime lab, examined the bullets and shell casings. She determined based on the rifling patterns and class characteristics, that the bullets were fired from a .45-caliber gun, and that it was likely modeled after a common 1911-type firearm. Kimber is one manufacturer that makes this type of .45-caliber gun.

San Diego Police Detective Luis Benavides canvassed the area and spoke to witnesses trying to determine the path of the silver car seen driving around the scene of the shooting. He obtained doorbell camera footage from the residential neighborhood, near where the shooting occurred. On one of the videos, collected from a street parallel to the shooting, two gunshots can be heard at approximately 9:25 a.m. The vehicle is then seen traveling eastbound on a connecting street, after running a stop sign. Benavides also obtained video footage from two businesses showing the vehicle traveling east on Mira Mesa Boulevard, a major road adjacent to the residential neighborhood, at 9:27 and 9:28 a.m.

### 4. Autopsy

Camacho suffered three gunshot wounds, each with an entry and exit point, including one through the right forearm, one to the chest, and one to

the right abdomen. The medical examiner traced the path of the bullets through Camacho's body, but testified that there was no way to determine the order in which the wounds were inflicted, and that it was "very possible" that a single bullet traveled through Camacho's forearm and into either his chest or abdomen. The bullet through Camacho's chest struck the heart and lower lobe of his right lung, likely causing his death. The medical examiner concluded the manner of death was homicide.

### 5. Evidence from Forehand's Car and Apartment

On October 6, 2022, at approximately 6:35 a.m., San Diego Police Officer Michael Boxer pulled over the silver car seen in the various videos driving around the area around the shooting. Forehand was driving and another individual, Iosefa Rodriguez, was in the passenger seat. The police collected cell phones from Forehand and Rodriguez.

The police searched Forehand's apartment around the same time. Stephen was in the apartment when the police arrived. The police did not find the suspected murder weapon in either the car or the apartment.

The police collected Stephen's phone. They then obtained cell phone records, including location data, which showed Stephen's phone traveling down Interstate 15 from Poway to Mira Mesa on the morning of the shooting. The phone was in the area of the homicide at 9:24 a.m.

The police also subpoenaed social media records and found a number of exchanges on Instagram. There were a number of photos showing Rodriguez and Stephen, some of which appeared to be taken in Forehand's apartment.

There were several messages from September and October 2022 in which Rodriguez was attempting to sell a .45-caliber Kimber firearm.

In an exchange on October 4, 2022, Rodriguez and Forehand discussed recruiting additional gang members at the "rec" after school hours.

Rodriguez said that the youngest member was "like 16" and told Forehand to "apply pressure on him, make them run fades [i.e., start fights] with each other." Forehand replied, "Set."

Additional messages suggested that Rodriguez sold a .45-caliber Kimber firearm gun to someone referred to as "Smacc" at around 6:30 p.m. on the day of the shooting. On October 6, 2022, Rodriguez responded to an inquiry about the gun, stating, "It's gone now." Certain messages indicated that Rodriguez was staying at Forehand's apartment for at least several days before the shooting, as he gave Forehand's address to different people for various reasons.

The web history on Forehand's phone showed that he looked at approximately 10 different news stories regarding the shooting. Stephen's phone showed that he viewed a YouTube video about the homicide. There were also notes that appeared to be lyrics to a rap song about killing someone in "broad daylight," "for the gang."

Forehand had an Instagram account with the handle "Pop-out" followed by a series of numbers. He exchanged messages with Stephen on the morning of the shooting. At 7:42 a.m., Forehand messaged Stephen that he planned to pick Stephen up from Stephen's residence in Poway at around 11:00 a.m. A couple of minutes later, Stephen asked Forehand if he wanted to just pick him up "right now." Forehand asked for some gas money, and Stephen sent some on Cash App. At 7:40, Forehand reported that he was on his way. Forehand said the drive would be approximately 40 minutes, and at 8:42 a.m., he told Stephen he had arrived. There was some discussion as to where exactly Forehand was and then, after 8:47 a.m., the communication ceased.

At 11:58 p.m. that evening, Stephen messaged Forehand, "You good?" Forehand responded, "Yeah. You?" Stephen said, "Yep. When you coming back?"

### 6. Recorded Jail Cell Conversations

#### a. *October 6, 2022*

Forehand and Rodriguez were detained and placed in a cell together on October 6, 2022. Their conversation was recorded, and portions were played for the jury at trial. Forehand made various incriminating statements.

Forehand expressed concern as to whether Stephen had "caught on," and stated, "I never thought I was gonna get locked up. Hey, thank God we got rid of it. It's sold. It's gone, bro." He also expressed concern that they were looking for "Daps" (i.e., Stephen). and explained that he gave the police the wrong apartment number, in an attempt to give Stephen a heads up.

At trial, Detective Christopher Notterman explained that just prior to putting them in the cell together, he lifted a piece of paper so that Forehand would see a picture of his car "in order to stimulate conversation in the holding cell." During the conversation, Forehand told Rodriguez, "he lifted up the paper, and it was, like, the car. It was a side profile of the car."

#### b. *January 18, 2023*

Forehand was released and then arrested again on January 18, 2023. At that time, the police conducted an operation where they placed undercover officers in the jail cell with Forehand, often referred to as a *Perkins* operation. Both of the operatives were older than Forehand. Forehand later testified that one introduced himself as a gang member, and the other as a major drug trafficker.

The People played a video containing portions of the conversation for the jury, over defense counsel's objection. Detective Notterman introduced

8

the recording and explained certain terminology used therein.  Although not included in the excerpts played for the jury, the trial court noted during pretrial proceedings that "at one point" during the operation, "the police arrive and Mr. Forehand clearly says he does not want to speak to them and clearly is asking for a lawyer."

Operative 1 initiated a conversation, telling Forehand that he had just been arrested that day.  Forehand told the operative that he had been arrested a month and a half prior, but they had let them go.  He said that all the police had was a side profile of the car, that he had just bought the car, and that there was "no gun, no nothing, no blood."

Operative 1 then told Forehand that he "got out of the joint" and "was running for the streets" in Los Angeles.  His "home boy" had gotten picked up three months before, so he figured that person had said something to the police and that's why he got arrested.  Operator 1 then said, "But . . . we got rid of that shit."

Forehand said he did not think the police had any "real concrete evidence," and Operator 1 asked, "Did you guys get rid of that shit?"  When Forehand did not immediately answer, Operator 1 said, "the big thing with these cases . . . is the burner."[3]  Forehand responded, "Yeah, well.  I'm from, like I told you, I'm from Asian Crip Boyz and it was like, I know for a fact on it, that, you know, it's, it's gone like not even, you know, not even in ghost type of shit."  Operator 1 said, "that's good," and then asked Forehand who else might be talking.

At one point, while discussing ring camera footage, Forehand said, "I wasn't there, I wasn't there.  They just, they wanted to probably drag me into this shit, 'cause of my car."  Later, Operative 2 explained that if the other

---

[3]     Notterman testified that "burner" is slang for a gun.

individual started talking first, he could flip their roles and allege that he was the driver and that Forehand was the shooter.  Forehand said the other individual was 17 years old, and Operative 2 said, "So, what you wanna hope is that he don't change the roles, you know?"

Later still, Operative 2 asked if the shooter "was getting jumped in," i.e., to join the gang, and if "that was the dirt that he did to get jumped in." Forehand said yes and that the shooter's name was "Daps."  Operative 2 asked if it was a drive by, and Forehand said, "nah, a hop out," meaning that Stephen got out of the car before the shooting occurred.  Operative 2 asked why they targeted Camacho, and Forehand said, "Just personal beef with the homie."  Upon further questioning, Forehand said the victim was an enemy and that it was "Street shit."  Operative 1 said, "At least it counts right?" and Forehand replied, "Well, it is.  I mean it counts."  Forehand told the operatives that Camacho was shot in the "in the body" in "broad day light."

## B.    Defense Evidence at Trial

Forehand testified in his own defense at trial.

Forehand admitted that he, Stephen, and Rodriguez were all members of the Asian Crip Boyz gang.  Forehand was 22 and Stepehen was 17 at the time of the shooting.  Forehand had only known Stephen for a couple of months.

Forehand said that he picked Stephen up from his house on the morning of the shooting, but was he not aware that Stephen had a firearm. Forehand also did not have a firearm in his possession on the day of the shooting.  However, on cross-examination, Forehand admitted that he knew Rodriguez had a gun, because Rodriguez had said that he could borrow it, and that Rodriguez and Stephen were hanging out at his apartment the night before, taking pictures in which they displayed gang related signs.

10

Forehand planned to drive Stephen back to Forehand's apartment to hang out, but Stephen asked if they could stop in Mira Mesa. Forehand did not ask why and relied on Stephen for specific directions once they got into the area. They drove up and down Deering Street slowly because Stephen was looking for a house but did not know the exact address.

At some point, Camacho came out of the house, and Stephen asked Forehand to stop the car. Forehand did not recognize Camacho. He explained that he later referred to Camacho as an "enemy" during the *Perkins* operation because he learned after the fact that Camacho was from a different gang.

Stephen got out of the car when he saw Camacho and walked to the rear, a couple of feet away from Camacho. Forehand stayed in the car, listening to music and looking at his phone. Stephen and Camacho began to have a discussion. The discussion escalated into an argument and Forehand heard two loud gunshots.

Forehand looked over his shoulder and saw Camacho hunched over, holding his stomach. Stephen ran back to the car and got in, and Forehand drove away. Forehand said that he was completely shocked. Forehand and Stephen drove back to Forehand's apartment, where Stephen stayed until the police arrived the next day. Forehand took a shower and went to work that evening. Forehand remained friends with Stephen but did not hang out with him as much after the shooting.

Defense counsel asked Forehand what emotions he was feeling during the *Perkins* operation, and he explained, "I was a little worried. I was really just trying to gather information. I was thinking maybe he's older, he's tatted head to toe, and he knows obviously more than I do. So from experience, he might be able to reflect and give me advice."

11

The defense's primary argument to the jury was that Forehand did not have any prior knowledge that Stephen intended to shoot Camacho.

### C.  Verdict and Sentencing

The jury found Forehand guilty of first degree murder. They also found true an allegation that Forehand, although not personally armed with a firearm, was himself a principal in the commission of the murder and was vicariously liable within the meaning of Penal Code section 12022, subdivision (a). The trial court sentenced Forehand to an indeterminate term of 25 years to life with an additional determinate term of one year based on Penal Code section 12022, subdivision (a)(1).

Forehand filed a timely notice of appeal.

## II.  DISCUSSION

Forehand asserts that the trial court erred by admitting portions of the January 18, 2023 *Perkins* operation, and that there was insufficient evidence that he was guilty of deliberate, premeditated first degree murder based on an aiding and abetting theory. We address each in turn.

### A.  Admission of Statements Made During the *Perkins* Operation

Forehand contends that in the course of the Perkins operation, he invoked his constitutional *Miranda*[4] rights to remain silent and to have an attorney present, and that the continued discussion after that invocation constituted improper custodial interrogation. In addition, he asserts the operatives violated his constitutional right to due process by utilizing both deception and an inherently coercive custodial environment to extract incriminating statements. He argues that the trial court therefore erred in

---

4    *Miranda* v. *Arizona* (1966) 384 U.S. 436, 444 (*Miranda*).

admitting the statements, and that the error requires reversal given the critical nature of the incriminating statements he made.

### 1.    The Trial Court's Ruling

The People sought to admit statements from the *Perkins* operation in pretrial proceedings. They asserted that a *Miranda* admonishment was not necessary because the *Perkins* operation did not amount to a custodial interrogation by law enforcement. Rather, Forehand "viewed his cellmates as confidantes," and willingly provided information about his case to them.

Forehand moved to exclude any statements made during the *Perkins* operation. He argued the statements were made following his *Miranda* invocation and therefore constituted involuntary statements obtained in violation of his constitutional privilege against self-incrimination and his constitutional right to due process. Before trial, defense counsel asserted Forehand's young age and the atmosphere in the holding cell—including the age and sophistication of the operatives—raised an inference that the statements were not voluntary.

The trial court indicated it had listened to the entire two and one-half hour recording,[5] and noted that, "in there, at one point, the police arrive and Mr. Forehand clearly says he does not want to speak to them and clearly is asking for a lawyer." But, the court found, "in listening to that almost two-and-a-half-hour *Perkins* operation, it's clear to me that Mr. Forehand talked freely. At no point did he appear to understand, realize, or suspect that the two operatives he was talking to were law enforcement or working for law enforcement." The court continued, "He appeared to be motivated solely by his desire to impress his fellow inmates . . . he had no reason to feel that they

---

5    We note that the full recording is not in the record on appeal, nor was it played for the jury.

13

had any legal authority to force him to answer questions or could affect his future treatment." Finally, the court found that Forehand did not seem afraid, "and he showed no hint of being intimidated by the atmosphere of jail."

Based on those factual findings, the trial court concluded the statements made during the *Perkins* operation were admissible, subject to some more limited exceptions under Evidence Code section 352.[6]

### 2.    Standard of Review

" 'In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, " ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 339.) More specifically, the question of whether the defendant's incriminating statements were voluntary or coerced is a mixed question of law and fact; we accept the trial court's findings as to the circumstances of the statements but independently determine whether those circumstances constituted coercive police activity. (*People v. Jones* (1998) 17 Cal.4th 279, 296; accord, *People v. Cromer* (2001) 24 Cal.4th 889, 901.)

### 3.    Relevant Legal Authority

The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against

---

6    For example, the court noted that portions of the discussion (i.e., Forehand talking about his father being shot and his mother being arrested) were not relevant; that there were a number of racial slurs; and that the transcript did not always accurately reflect the recording.

himself, and is often referred to as the defendant's right against self-incrimination.

In *Miranda,* the United States Supreme Court addressed the admissibility of statements obtained from defendants while in custody and held: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra,* 384 U.S. at p. 444.) It clarified that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Ibid*.)

The court in *Miranda* noted that the defendants in each of the several underlying cases had not been "given a full and effective warning" regarding their rights, and that each was interrogated "in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." (*Miranda, supra,* 384 U.S. at p. 445.) Specifically addressing one defendant's request for counsel, the court noted: "The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." (*Id.* at p. 469.)

Thus, following *Miranda*, it is fundamentally accepted that defendants must be "effectively apprised of [their] rights" to remain silent and to have counsel prior to any interrogation by a police officer. (*Miranda, supra,*

15

384 U.S. at p. 498.) "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Id.* at pp. 474–475.)

Later, in *Edwards v. Arizona* (1981) 451 U.S. 477, the United States Supreme Court clarified that, " 'an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease.' " (*Id.* at p. 485.) "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " (*Id.* at p. 482.) Thus, after a defendant has invoked their *Miranda* rights, a voluntary statement made without any prompting by law enforcement may be admissible, but further police-initiated contact (in the absence of counsel) would render any such statement inadmissible. (*Edwards,* at p. 487.)

It is important to note at this juncture that the defendants in *Miranda* and *Edwards* knew they were speaking with law enforcement officers. Another line of cases, beginning with *Perkins*, address situations like the one at hand here, where the defendant is not aware that they are speaking to a law enforcement officer.

Perkins was being held on an unrelated charge when the police received information from another inmate implicating Perkins in a murder that occurred a couple of years earlier. (*Perkins, supra,* 496 U.S. at p. 294.) Rather than question Perkins directly, the police placed an undercover agent in the cellblock with Perkins and the other inmate with instructions to engage in "casual conversation" and report back. (*Id.* at pp. 294–295.) The

16

undercover agent used the ruse of an escape plan to prompt a conversation, and Perkins ultimately disclosed incriminating details of the murder. (*Id*. at p. 295.) The agent did not give Perkins a *Miranda* warning, and Perkins did not know that the agent was a law enforcement officer or agent. (*Ibid*.)

The United States Supreme Court granted certiorari, "to decide whether an undercover law enforcement officer must give *Miranda* warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response." (*Perkins, supra,* 496 U.S. at pp. 295–296.) The court concluded that a *Miranda* warning was not necessary. (*Id*. at p. 296.)

The court in *Perkins* explained: "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect." (*Perkins, supra,* 496 U.S. at p. 296.) "When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Ibid*.) *Miranda* does not forbid "mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Perkins,* at p. 297.)

Of critical importance here, Perkins had not been read or invoked his rights under *Miranda*. (*Perkins, supra,* 496 U.S. at p. 294.) This was a distinguishing factor for Justice Brennan, who noted in a concurring opinion that the *Perkins* method still "deserves close scrutiny"; that there was evidence of "the deliberate manner in which [the operatives] elicited incriminating statements from respondent"; and that "the pressures of custody make a suspect more likely to confide in others and to engage in 'jailhouse bravado.' " (*Id.,* at pp. 302–303 (conc. opn. of Brennan, J.).) Justice

17

Marshall pointed out in his dissent that Perkins was nonetheless interrogated by police while in custody, and that *Miranda* "dealt with *any* police tactics that may operate to compel a suspect in custody to make incriminating statements without full awareness of his constitutional rights." (*Id.* at p. 306 (dis. opn. of Marshall, J.).)

California courts have since held that *Perkins*, and not *Edwards*, "controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 815; see also *People v. Tate* (2010) 49 Cal.4th 635, 685 [" '[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*' "].) This includes cases like the one at hand, in which an undercover police officer poses as an inmate to obtain incriminating statements *after* the defendant has invoked their rights under *Miranda*. (See *People v. Felix* (2024) 100 Cal.App.5th 439, 451 (*Felix*) [concluding *Perkins* applied where defendant invoked right to counsel during an interrogation and was then placed in a cell with an undercover detective because "defendant was not subjected to coercive interrogation of the type of which *Miranda* was concerned"].)[7]

---

[7] On November 20, 2024, the California Supreme Court granted review of the unpublished opinion in *People v. Allen* (July 22, 2024, B328333) (S286520) (*Allen*) to address:

> "(1) If a defendant has invoked his right to remain silent while being interrogated by a law enforcement officer, are incriminating statements obtained through a subsequent *Perkins* operation . . . admissible as substantive proof of the defendant's guilt at trial? (See [*Perkins*] 496 U.S. 292; [*Miranda*] 384 U.S. 436.)

Recently, this court published an opinion in which it concluded to the contrary—that a defendant's statements made during a *Perkins* operation, after he had invoked his *Miranda* rights, were inadmissible. (*People v. Zapata* (2026) 118 Cal.App.5th 529 (*Zapata*).) The court noted that, "Not all *Perkins* operations are the same" and, in that case, the "significant participation of a person known by [defendant] to be law enforcement while [defendant] was in police custody" at various points during the *Perkins* operation to put additional pressure on the defendant "raised the *Perkins* operation to a custodial interrogation." (*Id.*, at p. 541.) The court explained, while ploys " '*that do not rise to the level of compulsion or coercion to speak* are not within *Miranda's* concern,' [citation] . . . ploys which rise to the level of compulsion or coercion *remain* within *Miranda's* ambit." (*Id.*, at p. 540.)

With the foregoing authorities in mind, we turn to the specifics of the *Perkins* operation at issue in this case.

### 4. The Trial Court Did Not Err in Admitting Forehand's Statements During the *Perkins* Operation

Forehand asserts that the police used deceptive interrogation tactics to deliberately circumvent his invocation of his *Miranda* rights, in violation of the Fifth Amendment, and that the coercive nature of the tactics independently violated his Fourteenth Amendment right to due process.

The facts of the operation are largely undisputed. Forehand was placed in a cell, shortly after his second arrest, with two undercover law enforcement officers. Both were older than Forehand and both represented themselves as gang members and/or experienced criminals. When a known police officer

---

"(2) What effect, if any, does the fact that the interrogating officer continued questioning after petitioner invoked his Fifth Amendment right to silence have upon the admissibility of the statements subsequently obtained during the *Perkins* operation?"

19

entered the cell, Forehand invoked his *Miranda* rights, stating that he did not want to speak to law enforcement and that he wanted his lawyer. Yet the operatives continued to converse with Forehand, at times using details of the crime (that they had presumably learned from the police beforehand) to stimulate the conversation.

Forehand asserts this violated his constitutional rights. He asks us to conclude, broadly, that the police may not initiate or direct *any* conversation with the defendant once the defendant invokes their *Miranda* rights, and that other courts have misread *Perkins* when applying it in post-*Miranda* situations like the one at hand. To the extent Forehand intends to assert that *any* statement made during a *Perkins* operation after a defendant invokes his or her *Miranda* rights is inadmissible, pending guidance from the California Supreme Court in *Allen*, we decline to endorse such a broad rule, or to depart from the numerous opinions that conclude that such statements are admissible, in at least some circumstances. (See, e.g., *Orozco, supra,* 32 Cal.App.5th at pp. 811–812 [limiting *Miranda* to cases where the suspect-defendant was the subject of custodial interrogation]; *Felix, supra,* 100 Cal.App.5th at p. 451 [concluding *Perkins* applied where there was no coercive interrogation].)[8]

Rather, we acknowledge, as this court did in *Zapata*, that not all *Perkins* operations are the same. (*Zapata, supra,* 118 Cal.App.5th at p. 539.) In some cases, the defendant is simply having a conversation with someone

---

[8]    We note that the defendant in *Orozco* made the incriminating statements while talking to the mother of his deceased child in an interview room at the police station; he was not speaking to undercover operatives and presumably had some idea of the extent of the mother's relevant knowledge. (*Orozco, supra,* 32 Cal.App.5th at p. 808.)

20

they know, or an undercover officer whom they believe to be a fellow inmate; in others, law enforcement officers use tactics meant to increase the pressure on the defendant to make incriminating statements, for example, by reminding them that they are in the custody of law enforcement and potentially facing serious criminal charges. (*Id.*, at p. 540.) In *Zapata*, those tactics included law enforcement officers removing Zapata from the holding cell for "an elaborate lineup ruse" and "announcing the murder charge in the presence of the undercover operatives," all with the intent of stimulating further conversation. (*Id.* at p. 541.)

Here, it appears that at least one law enforcement officer interacted directly with Forehand during the *Perkins* operation, as the trial court noted during the recording, "the police arrive and Mr. Forehand clearly says he does not want to speak to them." But that is the totality of the evidence in the record before us regarding the direct involvement of known law enforcement officers during the *Perkins* operation in this case. While it is certainly possible that one or more law enforcement officers entered the cell more than once, as they did in *Zapata*, the trial court did not mention any further appearances or interactions after Forehand's invocation, there is no evidence of any further interactions in the record, and Forehand does not raise any additional interactions in his briefing on appeal. Thus, we are left to infer that, unlike the operation at issue in *Zapata*, here, Forehand was not subjected to continued, or recurring contact with a known police officer throughout the operation.

But continued overt police presence is not the only way in which a case may be distinguished from *Perkins* and its progeny. Rather, the questions we must consider are whether if, as Forehand asserts, the questioning was coercive, or the circumstances and actions of the police transformed the

21

*Perkins* operation into a "custodial interrogation." (See *Zapata, supra*, 118 Cal.App.5th at p. 541; *Perkins, supra,* 496 U.S. at p. 296; *Felix, supra,* 100 Cal.App.5th at p. 451.)

When a defendant alleges that "coercive, deceptive, and overreaching tactics to elicit defendant's incriminating statements in violation of due process," we focus whether " 'the deception is the type likely to procure an untrue statement,' " such that the defendant's will was overborne. (*People v. Fayed* (2020) 9 Cal.5th 147, 165.) Even if not coercive, a *Perkins* operation can run afoul to the defendant's rights if it rises to a "custodial interrogation", which, as the term suggests, "has two components: (1) custody and (2) interrogation." (*Zapata, supra*, 118 Cal.App.5th at p. 538, fn. 6.)

Here, as in *Zapata*, there is no dispute that Forehand was in police custody, in a holding cell, during the *Perkins* operation. (See *Zapata, supra*, 118 Cal.App.5th at p. 538, fn. 6.) We focus then on the term interrogation, which "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)

The undercover operatives went beyond a general jailhouse conversation. They frequently asked questions, inquiring as to who else might be talking to the police about the shooting, whether Forehand was sure that the gun used in the shooting was gone, whether it was a gang-involved shooting, and whether the victim got "domed" or shot in the head. They also put pressure on Forehand by suggesting that the police would not have picked him up again without some evidence, that the police could have found more evidence than he thought in his car, and that if Stephen decided to talk

first, he could tell the police that Forehand was the shooter and that he was the driver.

In addition, there is at least some evidence of coercive conduct, beyond the mere deception of the undercover agents posing as fellow inmates. Forehand was 21 years old at the time of the *Perkins* operation. It is now generally accepted that adolescence extends into the mid-20's. (See *People v. Hardin* (2024) 15 Cal.5th 834, 846.) The operatives were significantly older, and Forehand testified that one introduced himself as a gang member, and the other as a major drug trafficker. It is reasonable to expect that a young gang member might feel pressured to talk to an older, more experienced gang member for any number of reasons, including respect, spoken or unspoken gang rules, or fear of retribution. In addition, it is apparent that the undercover operatives used information they had received from the police to move the conversation along, including the fact that Forehand was aware that someone had "got[ten] rid of" the gun used in the shooting.

However, the fact that the undercover operatives lied to Forehand, by posing as fellow inmates and/or gang members, is not enough, on its own, to render the operation coercive. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [police deception or subterfuge is not per se sufficient to make confession involuntary]; *People v. Mays* (2009) 174 Cal.App.4th 156, 164–165 [same].) And here, the record does not support a factual finding that Forehand actually felt coerced or interrogated. (See *Perkins, supra,* 496 U.S. at p. 296 ["Coercion is determined from the perspective of the suspect"]; *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 [acknowledging deference to a senior gang member could be a factor in some cases, but finding no factual support where the record disclosed only that the defendant believed

23

the operative was a gang member who was nine years older than him].) Rather, the trial court's factual findings and Forehand's own testimony undercuts any inference that Forehand felt interrogated or coerced.

Forehand testified that he was "a little worried," but that mostly he was trying to gather information and that the operatives' ages and tattoos suggested to him that they had more experience in criminal matters and could potentially give him valuable advice. Forehand's testimony suggests that, if anything, he was worried about the repercussions of his involvement in the murder, not that he was worried about the older operatives. This is consistent with the trial court's finding, after reviewing the entirety of the operation (to which we must defer) that Forehand was not afraid, and had no reason to believe the operatives had any authority to force him to talk, or that they could otherwise affect his future treatment if he did not. Thus, it appears that Forehand continued to engage in the conversation primarily because he was trying to *gather* information himself.

For these reasons, the record before us is not sufficient to demonstrate that Forehand was coerced into giving incriminating statements, or that the *Perkins* operation in this case rose to a custodial interrogation. To be clear, we do not conclude that incriminating statements made during an operation of this type are always admissible, or that such an operation could never be characterized as coercive or as a custodial interrogation. For example, if there was evidence that the operatives applied pressure based on known gang culture to coerce statements from the accused and/or that the defendant actually felt fearful or obligated to respond to the operative's inquiries, that would change our analysis of the *Perkins* operation.

In sum, although we do have some concerns regarding the circumstances of the *Perkins* operation, including Forehand's young age, we

24

are unable to find, on this record, that the operation was coercive or that it rose to a custodial interrogation. Accordingly, we conclude that the trial court did not err in admitting the statements.

## B. Sufficiency of the Evidence for First Degree Murder

Forehand next asserts that even if the statements from the *Perkins* operation were admissible, there was insufficient evidence to support a conviction for first degree murder.

There is no dispute that Forehand was not the actual killer. Rather, the prosecution proceeded on a theory of direct aiding and abetting, and the jury found true a special allegation that although Forehand did not personally use a firearm, he was a principal in the commission of the offense.

Forehand asserts there was insufficient evidence to support the jury's verdicts because there was no direct evidence that he formulated, or even discussed, a plan to kill Camacho with Stephen; that he harbored a motive or intent to kill Camacho himself; or that he otherwise acted with premeditation or deliberation.

### 1. Standard of Review

The substantial evidence standard of review is a deferential standard. " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681.)

" 'In reviewing a challenge to the sufficiency of the evidence . . . we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is

reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)  " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*Ibid*.)  We " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid*.)  " ' "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*Ibid*.)

An appellant challenging the sufficiency of the evidence under the foregoing standards "bears an enormous burden."  (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

### 2. Aiding and Abetting First Degree Murder

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  (§ 187, subd. (a).)  Malice may be express or implied. (§ 188; *People v. Watson* (1981) 30 Cal.3d 290, 295 (*Watson*).)

"For a defendant to be liable as a direct aider and abettor, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' " (*In re Lopez* (2023) 14 Cal.5th 562, 579 (*Lopez*).)

In 2018, the Legislature passed Senate Bill No. 1437 and "made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory."  (*People v. Strong* (2022) 13 Cal.5th 698, 707.)  Among other changes, Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a

crime shall act with malice aforethought' to be convicted of murder. (§ 188, subd. (a)(3).) 'Malice shall not be imputed to a person based solely on his or her participation in a crime.' (*Ibid*.) One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine." (*People v. Curiel* (2023) 15 Cal.5th 433, 449.) Thus, as the law now stands, "[o]utside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' " (*Curiel*, at p. 448.)

All murder that does not fit within the definition of first degree murder in section 189, subdivision (a)—that is, "murder committed by specified lethal means 'or by any other kind of willful, deliberate, and premeditated killing,' or a killing which is committed in the perpetration of enumerated felonies"— is second-degree murder. (*Watson, supra*, 30 Cal.3d at p. 295.) Accordingly, to be guilty of first degree premeditated murder as an aider and abettor, Forehand must have assisted Stephen in the commission of the murder, with the intent that Camacho be killed.

Although not intended to be an exhaustive list, the California Supreme Court has "identified three categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing." (*People v. Perez* (1992) 2 Cal.4th 1117.)

### 3. Substantial Evidence Supports the Conviction

Forehand asserts there was no direct evidence that he participated in or was aware of a plan to kill Camacho. However, there was circumstantial evidence on which the jury could rely.

Forehand testified that he knew Rodriguez and Stephen because they all belonged to the same Asian Crip Boyz gang. Rodriguez had been staying

27

at Forehand's apartment and Forehand knew that Rodriguez had a gun. Stephen had also been hanging out with Forehand and Rodriguez at the apartment, and took photos there displaying gang signs.

On the day of the shooting, Forehand agreed to pick Stephen up from his home. They had originally planned for 11:00 a.m. but Stephen asked Forehand to come earlier. While there was no mention of the shooting in their written text exchanges, they did also speak on the phone, and likely further in person.

Stephen asked Forehand to drive him to Mira Mesa. Forehand claimed he did not ask why, but the jury was entitled to disbelieve Forehand's self-serving testimony. (See *People v. Llamas* (1997) 51 Cal.App.4th 1729, 1743 (*Llamas*).) Forehand admitted that he drove slowly up and down the street, knowing that Stephen was looking for a house but did not have the address. From this, the jury could infer that Forehand did have at least some idea that Stephen was looking for someone, and likely as part of his gang initiation.

Forehand stopped the car when they saw Camacho, allowing Stephen to get out and confront him. Forehand claimed that he just sat on his phone and did not pay attention to what was happening, but the jury was also entitled to disbelieve that assertion. (See *Llamas, supra,* 51 Cal.App.4th at p. 1743.) Indeed, on the other hand, there was also no evidence that Stephen gave Forehand any innocent reason as to why he was looking to confront Camacho outside Camacho's home that morning.

After hearing gunshots and seeing Camacho hunched over, Forehand did not make any attempt to render aid. Instead, Forehand drove Stephen back to his apartment and let him stay there while he went to work. Again, the evidence of Forehand's actions during and immediately after the shooting raised at least an inference that Forehand had at least some knowledge of

28

what Stephen intended to do, and that Forehand intended to help Stephen, for the benefit of the gang.

Later, during the *Perkins* operation, Forehand admitted that Camacho was an enemy of the gang. At trial, Forehand claimed he only learned that after the shooting, but again, the jury was entitled to disbelieve Forehand's testimony. (See *Llamas, supra,* 51 Cal.App.4th at p. 1743.)

Forehand also agreed, during the *Perkins* operation, that Stephen was getting initiated and "that was the dirt that he did to get jumped in." From this, the jury could infer that Forehand was both aware of and directly involved in recruiting and initiating new gang members. (See, e.g., *People v. Bonilla* (2007) 41 Cal.4th 313, 329 [jury could infer "departure and the circumstances thereof were consistent with and supported" theory of planned attack].)

There was additional direct evidence of motive as well; specifically, that the killing was done on behalf of the gang. The day before the shooting, Rodriguez and Forehand discussed recruiting new members and having the youngest member, who was 16, "run fades." During the *Perkins* operation, Forehand said the shooting was a "hop out," which directly suggests that the shooting was planned, and contradicts Forehand's assertion that Stephen just suddenly shot Camacho after an argument. And, finally, days after the shooting, Stephen wrote a note, or lyrics, stating: "Pop a sucka, get that b up on your belt. Being from the sucka side bad for your health. One up top EBK is that murder mesa thing. Ye, I did my bang. 45 did my rang. Chased a sucka broad daylight, fuck the mask, get the K. Strictly As, put the second chapter on the map. *Pop a sucka for the gang.*"

Although the police never found the gun, there was ample evidence that Stephen used the gun that Rodriguez had offered to Forehand, and that

Rodriguez disposed of the gun afterwards. Again, it was reasonable for the jury to infer that, at a minimum, Forehand had some knowledge of the gun being transferred from Rodriguez's possession to Stephen's around the time of the shooting. And there was direct evidence that Forehand knew the gun had been disposed of immediately after the shooting. While there was no direct evidence Forehand directly participated in its disposal, there was also no evidence that he did anything to prevent it. Instead, Forehand continued to assist in the cover up and said that he tried to give the police the wrong apartment number in an attempt to give Stephen a warning. (See *People v. Jurado* (2006) 38 Cal.4th 72, 121 [driving car during fatal attack, failing to separate or report the incident after, and participation in a cover up were all evidence of a conspiracy to kill]; *People v. Clark* (1967) 252 Cal.App.2d 524, 529 [defendant's failure to secure medical attention and attempt to conceal the murder weapon supported a finding of premeditation and deliberation].)

Finally, we do not dispute Forehand's contention that certain aspects of the shooting—including reports that he was playing loud music while driving around (thereby attracting attention to the vehicle)—suggest a certain level of "perfunctory" or "haphazard," as opposed to carefully planned, behavior. Nor is there any dispute that both Forehand and Stephen were young. But that is not the question before us. We are concerned only with whether there was substantial evidence from which the jury could reasonably decide that Forehand " 'aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' " (See *Lopez, supra,* 14 Cal.5th at p. 579.) We conclude that there was.

## III.   DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:


DATO, Acting P. J.


RUBIN, J.